IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 15, 2013

**STATE OF TENNESSEE v. ROBERT EDWARD FRITTS**

**Appeal from the Circuit Court for Anderson County**
**No. A7CR0219     Donald R. Elledge, Judge**

_____

**No. E2012-02233-CCA-R3-CD - Filed February 10, 2014**

_____

The Defendant-Appellant, Robert Edward Fritts, appeals his conviction for first degree premeditated murder, for which he received a sentence of life without parole. On appeal, he argues that (1) the trial court erred in allowing the State to introduce expert testimony regarding Fritts's gang affiliation, and (2) the evidence is insufficient to support his conviction. Upon review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and JEFFREY S. BIVINS, JJ., joined.

Mart S. Cizek, for the Defendant-Appellant, Robert Edward Fritts.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; David S. Clark; District Attorney General; and Sandra N.C. Donaghy and Victoria E. Bannach, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**Trial.** John Busler testified that he was married to the murdered victim, Teresa Busler, and that they lived at 128 Big Valley Road in Andersonville, Tennessee. Although he and the victim did not have any children together, the victim had one child, Dawn Stutler,[1] who was six years old at the time that he and the victim married. Several years later, Stutler moved out of the home until the State obtained custody of her. While in the custody of the State, Stutler had a child, B., when she was seventeen years old. Although the child was

_____

[1] Dawn Stutler is referred to throughout the trial transcript as Dawn Stetler, Dawn Stutler, and Dawn Fritts. To avoid confusion, we will refer to her as Dawn Stutler or Stutler in this opinion.

initially placed in the State's custody, Mr. and Mrs. Busler asked for and received custody of B. through the Department of Children's Services when the child was two years old.

Mr. Busler said Dawn Stutler had "sporadic" contact with B. until she and her husband Robert Fritts, the Defendant-Appellant, moved into the Busler's home. At the time, neither Stutler nor Fritts were employed. The Buslers were told that Stutler was pregnant with Fritts's child approximately one month after she and Fritts moved in with them. John Busler and the victim often encouraged Fritts to find employment.

Mr. Busler said that the Sunday before the victim's murder, Fritts asked him if he could get a ride to Knoxville on Tuesday so that he could go to the West Town Mall. That Tuesday, March 6, 2007, Mr. Busler awoke at 5:55 a.m. for work. At 6:20 a.m., he asked Fritts if he was still planning to ride to Knoxville with him, and Fritts told him that he was not planning on going and rolled back under the covers. Mr. Busler informed his wife that Fritts was going to stay at the house that day. He remembered that the victim was unhappy about Fritts staying at the house and believed that she was concerned because Stutler and Fritts often argued. Mr. Busler told the victim that he believed that it would be peaceful at the house that day because Stutler was not at home.

When Mr. Busler left for work at 6:25 a.m., he locked the doors to the house. He arrived at work at 6:55 a.m. and remained there until 4:36 p.m. He only left work one time for approximately ten minutes to walk across the street to a deli during his lunch hour before he returned to work. When he left work at 4:36 p.m., he drove home and arrived there at approximately 5:05 p.m.

When he got home, Mr. Busler used his key to open the door and realized that the deadbolt and the door lock were both unlocked. He walked into the house and looked for the victim so that he could drive her to work. As he walked through the kitchen to their bedroom, he saw what appeared to be a smear of blood on the floor. When he approached the doorway to their bedroom, he saw the victim's bare feet. He entered the bedroom and saw "blood all over the bed and walls" and his wife's deceased body.

Mr. Busler touched the victim, who was not moving. He saw that she had a severe head wound, and when he touched her head, he got blood and brain tissue on his left hand. Mr. Busler opened the door to B.'s room to check on her and saw that B. was fine. He then went to his neighbor's home to call 911 because he did not have a landline in his home. Mr. Busler called 911 and then returned home with the neighbor. He said he believed that the victim was still alive and checked on B. again before going outside to wait on the ambulance. The first officer to arrive was a female officer. Mr. Busler told this officer that he had come home to find his wife severely injured, and the officer told him to remain outside while she

went inside the home to investigate. He stated that he remained outside the house from that point forward.

Mr. Busler said that the only weapons he had at his house for protection were a hatchet and a hunting knife that he kept between the mattress and box springs on his side of the bed. He stated that the last time he had seen the hatchet and knife was three or four weeks before the victim's death and that they had both been under his mattress at the time. Mr. Busler stated that he had actually checked on the location of the hatchet and the knife because someone had used a knife to break the lock on a glass gun cabinet in one of the guest bedrooms of his house:

> I had a wooden glass door gun cabinet in the middle of our bedroom, our extra bedroom, which was kind of being used as a storage area. I was in that room and noticed that there were two doors at the bottom of the cabinet that locked, and the one door was locked, it had a small key in it. It had been tampered with and broken loose and opened. I was the only one that had a key to it. So I just got to wondering how that could have been opened and with the markings that were around the lock, it looked like there were some type of sharp object so I went to look for the knife to see if it had been used. The tip of the knife blade indeed was bent a little bit so I checked both items, the hatchet and the knife, when I looked at the knife.

Mr. Busler said that he discussed the bent knife tip with the victim and Stutler but did not remember discussing it with Fritts.

After officers arrived at his home on March 6, 2007, Mr. Busler was taken to the Anderson County Sheriff's Department, where he gave a statement about what had occurred that day. After giving the statement, he went to his brother's house and then went to the neighbor's house, where the Department of Children Services had temporarily placed B. until he gave his statement. He picked up B. and returned to his brother's house. Mr. Busler stated that he was allowed to return home on March 7, 2007. He immediately looked for his hatchet, but it was not under the mattress. However, on March 13, 2007, an officer with the Anderson County Sheriff's Department asked him to identify a hatchet and the hatchet's sheath that were found in the attic above the garage. He identified the hatchet and its sheath as his. Mr. Busler later found a notebook belonging to Fritts while he was cleaning the house. He stated that the notebook also contained Stutler's writing and that there were portions of the notebook that looked as if Stutler and Fritts had been writing notes to one another.

-3-

Mr. Busler stated that he had been employed as a painter before taking the job at Feroleto Steel. He said he was working on his home and doing paint jobs at other homes on the weekends, which was why there was a paint can and paint brushes in the home as well as a can of spray paint in the kitchen at the time of the victim's death.

Mr. Busler acknowledged that there was some discord in the household during the time period that Fritts and Stutler lived with him and the victim because he knew that either Fritts or Stutler had used his knife to break into the gun cabinet. Mr. Busler stated that he had told Fritts that he needed to find a job and take responsibility for the well-being of his family. He stated that Stutler's pregnancy did not create any problems in the household and that there was never any animosity between the victim and Fritts. However, he said that the victim was concerned that Fritts and Stutler were living with them and neither had secured a job or could take care of themselves. He described his wife, the victim, as "a very giving person, a very loving person, very tolerant."

Robert Mansfield, a sergeant with the Anderson County Sheriff's Department, testified that he was dispatched to the crime scene in this case for the purpose of locating the murder weapon. He was told to search the scene for anything that would be consistent with the wounds suffered by the victim. When Sergeant Mansfield entered the home, he walked to the kitchen area and immediately noticed the washer and dryer. He thought it was possible that the perpetrator might have attempted to clean the crime scene. When he examined the exterior of the washing machine, he saw areas that appeared to be dried. When he opened the washer's lid, he saw additional stains that appeared to be wet blood. He noticed that there were clothes inside the washing machine and there were red spots that appeared to be blood on the plastic part of the washer's agitator. He talked to Special Agent William Corbit of the Tennessee Bureau of Investigation (TBI) about the things he had seen inside and outside the washing machine, which were documented. He then watched the officers unload the washing machine, which contained several items of clothing as well as several towels with human tissue and bone fragments on them.

Bill Breeding, a detective supervisor with the Anderson County Sheriff's Department, testified that he was dispatched to a home at 128 Big Valley Road in Andersonville, Tennessee in March 2007. When he entered the home, he observed a deceased woman lying on the floor next to a bed in a bedroom located off of the kitchen. Detective Breeding stated that he walked outside to talk to Mr. Busler, called Dawn Stutler, and tried to find Fritts. Mr. Busler informed him that he owned a hatchet, which he kept in his bedroom. Detective Breeding stated that he was present several days later when other officers found the hatchet and its sheath in the Busler's attic over the garage. He stated that Mr. Busler identified the hatchet and its sheath as belonging to him.

On March 6, 2007, Detective Breeding talked to Fritts on the phone several times and attempted to get Fritts to come to the crime scene. He later talked with Fritts at the sheriff's department about what had happened at the victim's house that day and what Fritts's actions had been that day. Detective Breeding was present when all of Fritts's clothing, including a red hoodie, Reebok tennis shoes, socks, and shoe strings, were collected. He was also present when officers collected cheek swabs and nail clippings from Fritts. He stated that officers also collected cheek swabs from Dawn Stutler.

When Detective Breeding returned to the Busler's home, he was asked to look inside the washing machine and observed "traces of a red substance" and "hard objects" that looked like pieces of bones. He removed these items from the washing machine and gave them to another officer to collect as evidence. He also collected some towels from the washing machine.

Dr. Adele Lewis, the assistant medical examiner who supervised the victim's autopsy, was declared an expert in the field of forensic pathology. She said that during the autopsy, some hairs were found in one of the victim's hands and a substance that appeared to be paint was found on her face and on one of her hands. In addition, she observed that the victim's clothing contained a significant amount of blood. Once she cleaned the victim's body, she found several abrasions on the back of the victim's hand and wrist, which were blunt force injuries. She observed that the victim had a black right eye that occurred at or near the time of her death and some bleeding in the white part of the left eye. In addition, the victim had a large wound to the back of the head, a chop-type injury, with brain matter coming out of it. Dr. Lewis stated that this wound was the result of a combination of blunt and sharp force injuries on the head, which could have been caused by a boat propeller, a hatchet, an axe, or a machete. Dr. Lewis determined that the victim had suffered at least eleven different blows based on her visible wounds and that these wounds were the result of a substantial amount of force akin to a car wreck. She said the victim had sustained a large bruise to her calf and had an array of crescent shaped bruises on the back of her left shoulder, which were consistent with bite marks. In addition, the victim had an array of oval bruises on the back left side of the victim's neck near her ear, which were consistent with a suction injury commonly referred to as a "hickey." She noted that the victim also suffered an oval shaped skull fracture near the top of her head that was created by a blunt force object. Dr. Lewis stated that the victim's cause of death was "multiple sharp and blunt force injuries to the head," and the victim's manner of death was homicide. She stated that the hatchet found in the attic above the victim's garage could have caused the injuries to the victim in this case. Dr. Lewis acknowledged that she could only roughly estimate the time of a victim's death and said that the victim's death in this case "occurred some time within the 24 hours prior to her discovery being found dead, which was March 6, 2007, at 5:15 p.m."

Kenneth Campbell, a detective with the Anderson County Sheriff's Department, testified that he responded to a call at the Busler's home on March 6, 2007. He stated that he went to the Git'N'Go Market to review the store's surveillance tapes to determine if Fritts had been in the store around the time of the victim's death. He and another officer reviewed these tapes and observed Fritts buying a soda and exiting the store on March 6, 2007, around 4:00 p.m. He also talked with a female employee at this store.

On March 13, 2007, Detective Campbell returned to the Busler's home to continue to look for the murder weapon. After searching the home, Officer Campbell and Detective Jones searched the attic above the garage and found a hatchet lying on the floor of the attic. He stated that they did not touch or move the hatchet and when Agent Corbit arrived at the scene, he and Detective Ralph James collected it.

Special Agent William Corbit testified that he was contacted on March 6, 2007, about the victim's death and was asked to assist in investigating the case. After meeting with Mr. Busler and obtaining his consent to search the home, Agent Corbit supervised the interviews of some witnesses at the sheriff's department. He stated that Fritts voluntarily came to the sheriff's department to be interviewed and was not in custody at that time. Prior to the interview, Agent Corbit noticed a reddish brown stain that appeared to be blood on Fritts's pants. Agent Corbit stated that Fritts's clothes, shoes, and hat were collected at the completion of the interview. Following the interviews, Agent Corbit returned to the victim's house to look for the murder weapon, which he believed to be the hatchet that Mr. Busler kept under his mattress, and any additional evidence. Shortly thereafter, he and other officers found what appeared to be blood on the washing machine and towels inside and some white, hard objects that appeared to be bone.

Agent Corbit stated that the knife with the bent tip that Mr. Busler kept under his bed and the five pocket knives belonging to Mr. Busler that were collected did not have any evidentiary value and were not consistent with the murder weapon in this case. He said he was called to the crime scene on March 13, 2007, after the hatchet was found and that he and Detective James collected the hatchet and its sheath from the attic above the garage. On April 18, 2007, Agent Corbit discovered the spray can of Kilz primer and collected it as evidence. On the same date, he collected a Sponge Bob notebook that Mr. Busler had found. Agent Corbit read several of the entries in this notebook, which mentioned killing females with a hatchet and biting them, decapitation, and suburban serial killers. He acknowledged that the notebook contained the handwriting of several individuals and that he had not determined whether the entries he had read to the jury had been written by Fritts. He also acknowledged that he had not submitted the notebook to a handwriting expert and admitted that he could have gotten a search warrant for a handwriting sample from Fritts. Agent

Corbit also stated that oral swabs were taken from Fritts and Mr. Busler during the investigation.

Joseph Pinkerton, a child protective services investigator for the Department of Children's Services (DCS), testified that on March 6, 2007, he received a referral for Dawn Stutler's child, B. Pinkerton explained that B. had no custodian because one of her custodians had been murdered and the other custodian, Mr. Busler, was a suspect. He stated that he called the police and talked to them about the victim's murder and went to the neighbor's house to observe the child. Pinkerton said he spoke with B. and tried to get information about what had happened. He said that B. was healthy, acted appropriately for a two-year-old child, and did not appear to be in distress.

After speaking with Detective Duncan, Pinkerton left the child with the neighbor and went to the police station to talk to Mr. Busler and Dawn Stutler. Once law enforcement informed Pinkerton that Mr. Busler was not a suspect, Pinkerton allowed Mr. Busler to take custody of B. Pinkerton interviewed Dawn Stutler a few days later and with her assistance, tried to contact Fritts. When he met with Fritts a few weeks later, he asked him about the victim's murder.

Fritts told Pinkerton that on the day of the victim's murder, Mr. Busler came by his room and asked him if he needed a ride to work. Fritts told Mr. Busler that he did not have to work that day and did not need a ride. Later, Fritts said his work called to tell him that he did need to come into work, and Fritts began walking to work because he did not have a car. He told Pinkerton that he believed that the victim was asleep when he went to work and that he left the child with her. Fritts said that after he left the house, he changed his mind and decided not to go into work. Fritts said that work called him around 10:00 a.m. and that he left the house around 10:45 a.m. He said he eventually went to the West Town Mall in Knoxville before he was contacted by law enforcement around 5:45 to 6:00 p.m. He stated that B. was still in her room when he left the morning of March 6, 2007, and that Dawn Stutler, his wife, was not at the victim's home because she had spent the prior night at a friend's house. He stated that he never saw the victim that morning and believed she was asleep in her bedroom.

Agent Corbit was called a second time by the State to testify about his interview with Fritts that took place on March 6, 2007, between 7:00 and 8:00 p.m. He stated that Fritts was not in custody at the time and had agreed to voluntarily speak to the police. Fritts told Agent Corbit that he had been asleep the morning of March 6, 2007, before receiving a message at 10:15 to 10:30 a.m. from Matt, his manager at Arby's, asking him to come into work that day. Fritts said he got up and put on a red sweatshirt and blue jeans. When he left the house at 10:45 a.m., he accidentally forgot to lock the door. He began walking to work, but once

he got to the Shell Station near the interstate in Clinton, he chose not to go to work. Fritts told Agent Corbit that when he left the house that morning, both B. and the victim were asleep in their bedrooms. He said he did not hear any noises coming from the victim's bedroom and that her bedroom door was closed when he left. Fritts said that Dawn had spent the night of March 5, 2007, with a friend. He said he was at the West Town Mall when law enforcement first called him to let him know that something had happened to his mother-in-law. After that, he called his mother to pick him up and take him to the sheriff's department in Clinton. After he talked to law enforcement, Dawn Stutler called to tell him that the victim was dead.

At the request of defense counsel, Agent Corbit read Fritts's March 6, 2007 statement in its entirety to the jury:

On 03/06/07, I Robert Edward Fritts, provided TBI Special Agent Andy Corbit with a written statement. I was explained that this was a voluntary statement and I was free to stop speaking at any time. I am married to Dawn [Stutler] and we live with her parents at 128 Big Valley Road in Andersonville. My mother in law is Teresa Busler and my father in law is John Busler, but I call him Steve. My wife Dawn has a two[-]year[-]old daughter named [B.]. I have been married to Dawn since January 2nd, 2007 and she is pregnant with our child that is due in April 2007. The Busler[]s have legal custody of [B.]. I have lived at 128 Big Valley Road since around October 31, 2007. . . . There are four adults and one child that live in the home. I work at Arby's restaurant by the interstate in Clinton. I work first shift and usually go in at 8:30AM and work until 5:00PM. I usually ride to work with Steve and he drops me off at Arby's each day around 6:30AM on his way to work in Knoxville. I was scheduled off today and a manager, possibly Matt, called at about 10:00AM on my cell phone, 384-6228. Matt left a message calling me into work. I heard the message around 10:15AM to 10:30AM. I got read[y]. "Did not shower." I put on my clothes which were a red hoodie, sweat shirt, blue jeans, tennis shoes, and a black t-shirt. . . . My car is broke down. "Subaru." So I had to walk to work from my house on Big Valley Road. When I left my house I accidentally forgot to lock the front door. I continued walking toward the interstate and by the time I got to the Shell station by the interstate, I decided not to go to work because I did not feel like it. It usually takes me one to two hours to walk from Big Valley Road to my work at Arby's. . . . I walked down the [two-]lane [road] I have walked to work four or five times in the past. I left the house on Big Valley Road at 10:45AM this morning and I have not been back since then. When I left [B.] was asleep in her room and Teresa was asleep "assume" in her room. I did not

hear any noise and both doors were closed. I woke up around 10:00AM this morning, and I used the bathroom and ate some cereal while I watched TV in the living room. My wife Dawn was at . . . a friend's house in Medford by the name of Martha and Sabrina. Dawn was visiting them and Martha was hospitalized last night and she helped Sabrina take care of her baby. Dawn and I have not had any recent arguments. Dawn did not stay at home last night because she stayed with Sabrina. She went to Sabrina's house around 2PM yesterday. I did not talk to [B.] or Teresa this morning. I slept in the bedroom with [B.] last night. I recall Steve asking if I needed to ride to work this morning but I said no. I went back to sleep until 10AM. . . . I get along with Steve and Teresa and there have not been any recent arguments with Steve and Teresa . . . [Teresa was] alive . . . last night when she came home from work "Cracker Barrel, Lake City." Teresa was picked up by Steve last night and came home around 11:30PM or midnight. Teresa came in and did some dishes and laundry last night. I went to bed around 12:30AM. [B.] was already asleep and she went to bed around 11:45PM. I don't recall what time Steve and Teresa went to sleep. I did not notice them arguing and their moods appeared okay. Teresa usually gets up around 1[:00] to 2:00PM but there is no set time. Teresa will usually stay in bed until after lunch. Steve is usually up in the morning around 5:30AM to 5:45AM. I am normally [up] when I work at about 5:30AM. Teresa usually leaves for work at around 5:30PM and Steve takes her to work each day. Steve gets home each day around 5PM from work. . . . Steve drives the tan Lincoln and I have a Subaru that is broke down. When I got to the area near my work today I used my cell phone to get a ride but I was unsuccessful. I met up with a stranger named Doug by the entrance ramp "south side I-75." At around 4PM I went to Git'n'Go to buy a Code Red Mountain Dew. I said hello to a friend named Charity that works there. I then walked to the southbound on ramp. I recall Doug being a white male heavy set late 30s to early 40s with long red hair and a red beard. Doug was wearing a tan shirt and greenish colored jogging pants. Doug was driving a gray station wagon and he picked me up around 4:15PM. Doug pulled over and asked if I needed a ride. I asked Doug to take me to West Town[] Mall. We traveled down I-75 to I-40 west to the West Hills exit. I did not compensate Doug in any way for the ride. . . . Doug let me out at the West Hills exit near Kingston Pike. Doug talked about God and said that God was watching over me. I walked over to West Town[] Mall and went in through Dillards to the bathroom in the food court. I spoke to Katie from fifteen to twenty minutes who was a friend that worked at Taco Bell in the food court. I also went to the stores Hot Topic, Spencers, and Game Stop. While I was at the mall I received a call from Bill Breeding and I was informed that something had happened to

my mother[-]in[-]law. I don't recall the time but it was starting to get dark. I called my mother Rebecca Fritts to pick me up and I was picked up at the mall near JC Penn[e]y. I exited the mall through the parking garage. When my mom picked me up we came straight to Clinton to the sheriff's department. . . . When I was in Clinton earlier today walking around at the Clinton exit, I walked past my work location, I walked past the high school around the SunTrust bank area. When I left the house this morning the front door was completely shut and both doors to [B.]'s and Teresa's rooms were shut. I did not hear any sounds today at the house that would indicate a fight or a struggle. I do not have a key to the house and I usually lock the bottom lock when I leave. I called my manager, Steve, . . . and [h]e said I did not have to work today. My wife thought I was working today. I spoke to Sabrina today to get in touch with my wife after I learned something happened to my mother[-]in[-]law. Dawn called me from 128 Big Valley Road and told me Teresa was dead. I did not ask Sabrina if Teresa was dead or still alive prior to finding out this information from Dawn "wife" . . . . I do not have a clue who did this to Teresa and I have nothing to hide. I did not have anything to do with the death of Teresa.

Agent Corbit talked to Fritts again on March 8, 2007, after Fritts was informed of his Miranda rights. In his second written statement, Fritts admitted that he had been dishonest with Agent Corbit when he said he had been called into work on March 6, 2007; however, he insisted that he had not hurt the victim and was not there when she was killed. When Fritts gave this second statement, Agent Corbit concluded that Fritts had lied to him about what he claimed had happened the day of the victim's death.

Matthew Brian Sergent, Fritt's manager at Arby's, testified that Fritts was not scheduled to work at the Arby's in Clinton on March 6, 2007. He stated that he never called Fritts to work and never left a message for him to work on March 6, 2007. In addition, he stated that he was not aware of any other managers calling Fritts that day. He said Fritts did not work at all the week of March 5-11, 2007.

Juanita Cox, the assistant manager at Arby's in Clinton, testified that Fritts was not scheduled to work on March 6, 2007. She also testified that she did not call Fritts into work on March 6, 2007 and did not know of anyone else that called him into work that day.

Jill Longmeyer, who knew Dawn Stutler when she was in elementary school, testified that she and her husband owned a school bus line. She said she saw Stutler five days a week during the school year when she was driving one of the school buses. Longmeyer said that she had seen Stutler and Fritts pass by their house three or four times. On two or three

-10-

occasions, which occurred within six months of the victim's death, Stutler was yelling at Fritts to stop, and Fritts told her to shut up. Longmeyer noted that it was rare to see anyone walking in the area near her house because there were no sidewalks. On March 6, 2007, at 4:00 p.m., Longmeyer saw Fritts walking to the left of her home. She recalled that Fritts was wearing a bright red sweatshirt and dark pants at the time. She stated that the Busler's residence was only a short distance away from her home.

Charles Douglas Powell testified that on March 6, 2007, he lived at 205 Big Valley Road in Andersonville, which was approximately one hundred yards away from the victim's home. On March 6, 2007, Powell went home for lunch and saw a man wearing a bright red sweatshirt with the hoodie pulled up and jeans walking westbound down Longmeyer Road in front of Longmeyer's deli at 4:02 or 4:03 p.m.

Charity Thompson, who worked at the Git'n'Go convenience store in Clinton at the interstate, testified that she saw Fritts inside the store between 4:00 and 4:15 p.m on March 6, 2007. She saw him exit the store and walk down the road toward the interstate. She stated that he was wearing a red hoodie, a black hat, dark blue jeans, and black shoes at the time.

Katherine Hancock, who worked at the Taco Bell at the food court in West Town Mall, testified that Fritts was a friend from the mall and that they were part of a group of friends who spent a significant amount of time at the mall. She stated that she saw Fritts on March 6, 2007, between 5:00 and 6:00 p.m. while she was working at Taco Bell and talked to him for about five minutes. She said that Fritts was walking around the mall looking for friends. Hancock recalled that Fritts was wearing a red sweatshirt he often wore that had the name of the Insane Clown Posse band on it as well as a picture of "the Wraith," which is a devil with red horns and a red cape. She also remembered Fritts wearing a black baseball cap that day.

Jamie Woodward, a lead officer in security at West Town Mall, testified that Fritts was friends with a group of teenagers who frequented the West Town Mall, wore alternative clothing, and were known as "mall rats." Woodward stated that he saw Fritts in the food court area of the mall on March 6, 2007, or March 7, 2007, and that Fritts was wearing dark pants, a red sweat shirt, and a ball cap. He also saw Fritts at the mall on March 10, 2007, and on that date Fritts told him that his mother-in-law had been killed and that the police believed that he was responsible. Fritts said that the last time he had seen his mother-in-law was at 10:45 a.m. on March 6, 2007.

Robin Ward, the victim's co-worker at Cracker Barrel, testified that she had a conversation with the victim on March 5, 2007. During that conversation, the victim stated that Fritts made her feel very uncomfortable and that she was afraid of him.

-11-

Dawn Stutler testified that she and Fritts were married on January 2, 2007. She stated that she met Fritts at the West Town Mall and that they were "mall rats." Stutler stated that Teresa Busler, the victim, was her mother and that she and Fritts lived with her mother and stepfather, John Busler, at 128 Big Valley Road. She stated that she had spent the night of March 5, 2007, with her friends Sabrina Hawkins and Martha Wilson and that they had all gone to the Wal-Mart hair salon in Oak Ridge on March 6, 2007. That day, she signed into the Wal-Mart hair salon at 11:29 a.m. and had stayed at the salon until 4:00 p.m. She said she was at Sabrina's house when Fritts called her around 5:00 p.m. and told her something had happened to her mother and that the sheriff was going to call her. During that conversation, Stutler said that she was angry at Fritts because he had not answered his phone when she had tried to call him while at the hair salon. She was unhappy with Fritts because he was supposed to be at home watching B. that day. Fritts told her that something bad had happened, and he seemed upset because no one would tell him what had happened. During her call with Fritts, an officer called her and asked her to come home. Stutler said she knew that something had happened based on her conversation with the officer, but she did not believe that anything very serious had occurred. She said her friend Sabrina Hawkins drove her home and during the drive, she talked to Fritts, who was upset because no one would tell him what had happened. When she arrived home, her stepfather John Busler told her that her mother was dead.

Stutler stated that Fritts had a tattoo of a hatchet man, which is a symbol associated with the Insane Clown Posse band or ICP, and that she later got the same tattoo. She said Fritts wore ICP clothes, which depicted faces or the hatchet man logo, and he had a silver necklace with the hatchet man on it. In addition, she said Fritts wore non-prescription, white colored contact lenses that made his eyes look like they were all white.

Stutler stated that the Sponge Bob notebook her stepfather found belonged to Fritts and that Fritts had this notebook when they met. She said that she did not believe the first five pages of the notebook were in Fritts's handwriting, even though she admitted previously telling the prosecutor that these pages were in Fritts's handwriting. She acknowledged that the last of the five pages of the notebook titled "Prep School Murders" could have been in Fritts's handwriting. She also acknowledged that she changed her mind about whether Fritts's handwriting was on these first few pages of the notebook after meeting with Fritts's attorney. Stutler admitted that she had shown Fritts the location of the knife under her stepfather's side of the mattress. She also admitted that the hatchet was in the same location as the knife.

Stutler said she and Fritts often walked places from their home on Big Valley Road. She said they often argued and one time, she threw rocks at him. She acknowledged telling law enforcement officers that some of the lyrics in Fritts's notebook were "very messed up"

because they discussed killing people. She told the officers that the lyrics "creeped [her] out" but did not recall telling the officers that Fritts wrote the lyrics in the notebook. Stutler said that Fritts listened to ICP music and owned some ICP clothing; however, she said that Fritts was not obsessed with ICP.

Troy Williams testified that in July 2007 he was incarcerated with Fritts in the Anderson County Detention Facility. He said that he and the other inmates called Fritts "Hatchet man" because of Fritts's tattoo and because of the crime he had committed. Williams said that Fritts told him about his murder charge and told him that he did not get along well with his mother-in-law because she thought that he was not helping Stutler, was not contributing financially, and was not a responsible person. Fritts also told Williams that the police had found the murder weapon in an attic and had found blood on his clothing and blood stains on his shoes and pants.

Dustin Dalton testified that in 2008 he shared a cell with Fritts for two months while incarcerated in the Anderson County Detention Facility. He said Fritts showed him lyrics he had written, which sounded like the band ICP, that talked about "hacking your brains out and I'll cut your f-ing head off" and "I'll split your wig open[.]" Dalton said that when he asked Fritts why he killed the victim, Fritts replied, "I just snapped. And when I came to, she was dead." Fritts said that he was wearing his uniform from either Arby's or Wendy's at the time.

Although the defense stipulated during a jury-out hearing that Thomas Walker, a detective with the Gang Unit of the Knox County Sheriff's Department, was "qualified as an expert on gangs," his testimony during that hearing is relevant to the admission of gang-related evidence in this case. Detective Walker testified that the Insane Clown Posse or ICP, was "a rap band or horror core band" and the ICP gang was an offshoot of the musical group. ICP gang members referred to themselves as "jugalos" or "jugalettes" and did not believe in abiding by society's laws. They did not work, did not bathe, and rebelled against everything. He explained the belief system of an ICP gang member:

> Basically, they just want to listen to music, you know, play video games, write their own lyrics to their songs. They have to live the life of a good jugalo in order to pass the six trials and tribulations of the dark carnival, which are the six clowns that are featured on the six albums. Each album has its own meaning. You have to listen to it and figure out what your hidden meaning is for each album, in order that when you die your spirit is drug into the dark carnival and then you must pass the six trials and tribulations to make your way into Shangra-Lai or hell's pit depending on your belief system on that.
>
> . . . .

Okay. Basically once you pass your six trials and tribulations, if the clowns believe you've lived the life of a good jugalo, then you will go to Shangra-Lai. They don't believe that at any given time during the six trials and tribulations then you will go to hell's pit. How you live the life of a good jugalo depends on the individual philosophy of the individual listening to it.

You can take the songs of ICP literally which say, you know, you're supposed to kill people or you're supposed to dismember or whatever or you just don't follow society's rules. You don't want to get a job. You live off of whatever you can. You know, it's just not following society's rules and laws.

Detective Walker stated that the "Wraith", one of the clowns in the ICP belief system, had two horns, wore a red outfit, and had a raven on his shoulder. He stated that Fritts was wearing a shirt bearing a picture of the Wraith on the day of the victim's death, which was collected by the police. Detective Walker stated that Fritts had a tattoo which stated, "a jugalo for life" on his arm and another tattoo on his forearm of the running hatchet man, which is the logo for Psychopathic Records that produces the Insane Clown Posse music.

Detective Walker provided a copy of Fritts's notebook for the trial court to review. He stated that ICP members often write their own lyrics, and he found these types of lyrics in Fritts's notebook. In addition, Detective Walker relied on information from an inmate about Fritts writing lyrics that spoke about hacking brains out and splitting brains open to categorize Fritts as an ICP gang member. He stated that Fritts's lyrics were related to the ICP gang because several ICP songs referenced decapitation, mutilation, and dismemberment. He stated that the term "splitting wigs" meant to "split your head, where your wig would be" and was a common term used by the ICP gang.

At the conclusion of the jury-out hearing, the trial court ultimately found that Detective Walker could testify and form an opinion "as to the identification and classification of gangs and gang members."

At trial, Detective Walker testified consistently with the above testimony and further opined that Fritts was a member of the ICP gang based on Fritts's sweatshirt depicting "Wraith", the lyrics in his notebook, his tattoos of the "Running Hatchet Man" and "Jugalo for Life," which were displayed to the jury, and the fact that he spent a substantial amount of time at the West Town Mall.

Richard Parker, a lieutenant with the Anderson County Sheriff's Department, testified that he monitored and supervised the booking office and staff at the Anderson County Jail. On September 25, 2009, Lieutenant Parker told Officer Michael Finney to confiscate Fritts's

white shoes because they had graffiti written on them. He stated that Fritts had purchased shoes through the commissary at the jail and that the jail considered any writing or drawings on the shoes to be contraband. Lieutenant Parker examined the graffiti on the shoes, which stated, "M.C. Axe." He explained that gang language on objects can cause a security threat because gang members who are incarcerated are constantly competing for power.

Agent Corbit was called by the State a third time and testified that during Fritts's interview at the sheriff's department the day of the victim's death, he noticed a reddish brown substance on Fritts's pants. At the conclusion of the interview, he asked to collect Fritts's pants and asked him about the stain on his pants. Fritts stated that the stain occurred when he had a nose bleed a week prior to the date of the interview.

Paulette Sutton was declared an expert in the field of blood stain pattern analysis. She testified that the victim suffered at least ten blows with a hatchet-like weapon.

Dr. Murray Marks, an employee of the University of Tennessee Medical School, was declared an expert in the field of forensic anthropology. He stated that he received three packages from Agent Corbit for his examination. Dr. Marks stated that the contents of two of the packages were pieces of bone from a human skull. He stated that although the contents of the third package appeared to be bone, the item was too small for him to determine whether it was human bone.

Hoyt Phillips, a Special Agent Forensic Scientist with the TBI, was declared an expert in the field of latent fingerprints. Agent Phillips stated that although he was able to identify several latent fingerprints collected from the scene, he was unable to determine to whom these prints belonged. He said he examined the hatchet and its sheath that were found in the attic above the garage, but he was unable to find the presence of any latent fingerprints. In addition, he tested the spray can of primer and determined that the latent prints on the can did not match the known fingerprints of Fritts.

Randall Kirk Nelson, a Special Agent Forensic Scientist in the micro analysis unit of the TBI laboratory, was declared an expert in the field of microanalysis of paint and glass. He testified that he examined Fritts's clothing, an Arby's shirt from a hallway closet in the victim's home, a can of paint from the bathroom, the victim's clothing, two swabs from the victim's face, a spray can of Kilz Primer Sealer, and a sheet from the victim's. He stated that he did not find any paint on Fritts's jeans, left shoe, and sweatshirt. He stated that he did not analyze the paint can from the bathroom because the paint on the Arby's shirt and the victim's clothing appeared to be spray paint and the paint from the bathroom was a liquid can of paint.

When Agent Nelson analyzed the Arby's shirt, the victim's sweatshirt, the swabs from the victim's face, and the sheet from the bedroom, he determined that all of these items had paint on them that was consistent in color, binder composition, and pigment composition. He stated that the paint from these items could have come from the same source or different sources with the same binder and pigment composition. However, Agent Nelson stated that the paint in the Kilz spray can was not consistent with the paint on the Arby's shirt, the victim's sweatshirt, the swabs from the victim's face, or the sheet from the bedroom. He then determined that the paint in the paint can was inconsistent with those pieces of evidence.

Linda Littlejohn, a Special Agent Forensic Scientist, was declared an expert in the field of microanalysis with a specialization in shoe print analysis and comparisons. Agent Littlejohn determined that the size, shape, and tread design from Fritts's right shoe, which was found in the victim's living room, was consistent with a partial shoe print from blood in the victim's kitchen. With a different print, she was unable to do a physical comparison but conducted a visual comparison and concluded that Fritts's shoe and the partial print had the same tread design and appeared to be similar. Agent Littlejohn stated that she was not aware that cats were running through the crime scene as evidence was being collected. She stated that although it was not ideal for pets to be running through the scene, it did not affect her evidence as much as it might have affected someone else's evidence.

Chad Johnson, a Special Agent Forensic Scientist with the TBI, was declared an expert in the field of serology and DNA analysis. Agent Johnson stated that he examined Fritts's jeans and visually determined that there was a reddish brown stain that appeared to be blood in several places on the jeans. He then conducted a test, which was positive that these areas were presumptive blood. He then compared the blood on Fritts's jeans to the known standard from the victim and concluded that the blood on Fritts's jeans belonged to the victim. In addition, he concluded that the blood from Fritts's right shoe belonged to the victim. Agent Johnson also concluded that the blood from one of Fritts's shoes found in the living room was consistent with that of the victim. When he tested the hatchet, he determined that a partial profile existed that was consistent with the victim's blood.

The Defendant-Appellant's mother, Rebecca Fritts, testified that she picked up Fritts on March 6, 2007, at the West Town Mall after the police contacted him. She stated that Fritts had called her earlier in the day for some phone numbers of friends to take him to the mall and that he exhibited his normal demeanor during that conversation. During their second conversation, Fritts notified her that he had gotten a call from the sheriff's department and "was a little bit upset after that." She stated that she picked up her son from the mall, and when her son discovered that his mother-in-law was dead, he became "very upset." She testified that pages one, two, three, four, five, six, and seven of the notebook were not in Fritts's handwriting. She acknowledged that Fritts's handwriting was on page eight of the

notebook and that Fritts's and Dawn Stutler's handwriting was throughout the rest of the notebook.

Fritts declined to testify.

## ANALYSIS

**I. Evidence of Gang Affiliation.** Fritts concedes that he did not object to Detective Walker testifying as a gang expert but asserts that he did object to Detective Walker's testimony "as it provided no assistance to the jury that if in fact [he] was a member of an ICP gang assisted the jury in determining as to whether or not his gang affiliation connected him to this homicide." Although unclear, we understand Fritts's argument to be that Detective Walker's testimony regarding Fritts's membership in the ICP gang did not assist the jury in determining whether this gang affiliation connected him to the homicide in this case. Fritts also argues that Detective Walker's testimony "had little to no probative value and the testimony that [he was] a fan of the Insane Clown Posse was only prejudicial to [him] and should have been excluded." Finally, he argues that the State failed to establish how the evidence offered by Detective Walker was relevant to a fact in issue as required by Tennessee Rules of Evidence 401 and 402. The State responds that the trial court properly allowed Detective Walker to testify about Fritt's gang affiliation because this testimony was relevant in establishing Fritts's motive for killing the victim. We conclude that the trial court did not abuse its discretion in allowing Detective Walker to testify because this testimony substantially assisted the jury in identifying Fritts as the perpetrator in this case.

"Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). Upon review, a trial court's ruling regarding expert testimony will not be overruled unless the trial court abused its discretion. Ballard, 855 S.W.2d at 562 (citing Baggett v. State, 421 S.W.2d 629, 632 (Tenn. 1967)). Under this standard, we will not reverse unless the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Rule 702 of the Tennessee Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The witness's necessary expertise may acquired through formal education or life experiences.

State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002) (citing Neil P. Cohen, Donald F. Paine, & Sarah Y. Sheppeard, Tennessee Law of Evidence § 7.02[4] at 7-21). However, the witness must possess such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise exceeds the scope of common knowledge and experience possessed by the average person. Id. (citing Neil P. Cohen, Donald F. Paine, & Sarah Y. Sheppeard, Tennessee Law of Evidence § 7.02[4] at 7-21). Tennessee Rule of Evidence 703 provides guidance regarding the proper bases for expert testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703. "Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." State v. Ferrell, 277 S.W.3d 372, 378 (Tenn. 2009) (citing State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007); Ballard, 855 S.W.2d at 562).

In the presence of the jury, Detective Walker was declared an expert in the field of identification and classification of gangs. He said he concluded that Fritts was a member of the ICP gang, an offshoot of the Insane Clown Posse band, based on specific criteria. He explained that the Insane Clown Posse band promotes violence through its music, which references decapitation, mutilation, and disembowelment and that followers of this band, called jugalos or jugolettes, are identified as members of the ICP gang when they commit crimes in the name of the gang. Detective Walker stated that the ICP gang had been designated as a street gang in Knox County and had been recognized as a gang in other parts Tennessee. He stated that the "Running Hatchet Man," which is a symbol of the Insane Clown Posse band, is commonly used in identifying ICP gang members. He also stated that a common hangout for the ICP gang is the West Town Mall in Knoxville. Detective Walker testified that many ICP gang members write their own lyrics and that he found similar lyrics, which mentioned decapitation, mutilation, and dismemberment, in Fritts's notebook. He also stated that white paint is part of the typical makeup for followers of the Insane Clown Posse band. He opined that Fritts was a member of the ICP gang based on the red hoodie

sweatshirt bearing the picture of "the Wraith" that he was wearing the day of the victim's death, the lyrics written in his notebook, his tattoos of the "Running Hatchet man" and "Jugalo for Life" that were displayed to the jury, and the substantial time he spent at the West Town Mall.

This court has previously concluded that evidence of gang affiliation is "character evidence subject to Rule 404(b)." See State v. Orlando Crayton, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., June 27, 2001); State v. Ronald Eugene Brewer, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566 (Tenn. Crim. App. July 14, 2011), perm. app. denied (Sept. 21, 2011). Rule 404(b) of the Tennessee Rules of Evidence provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person or to show action in conformity with the character trait. While evidence of a prior crime, wrong or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, motive, opportunity, or absence of mistake or accident.

Given the above evidence, we conclude that Fritts's affiliation with the ICP gang was relevant and admissible because it assisted the jury in identifying him as the perpetrator and established his motive for the offense. See Crayton, 2001 WL 720612, at *3-4. Specifically, Detective Walker's testimony connected Fritts's membership in the ICP gang to the victim's murder because it explained the violent manner in which the victim was killed, the use of a hatchet as the murder weapon, and the presence of white paint on the victim's hand and face. See Tenn. R. Evid. 401 (""Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Moreover, we conclude that the probative value of this evidence, to assist in identifying Fritts as the perpetrator, was not substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Accordingly, Fritts is not entitled to relief on this issue.

**II. Sufficiency of the Evidence.** Fritts also argues that the evidence is insufficient to sustain his conviction for first degree premeditated murder. He contends that there was no witness who identified him as the person who killed the victim and there was no proof of premeditation. In response, the State asserts that there was sufficient evidence presented

from which a reasonable juror could find that Fritts committed first degree premeditated murder. We agree.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000).

-20-

The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The State may prove the perpetrator's identity using only circumstantial evidence. Rice, 184 S.W.3d at 662 (citing Reid, 91 S.W.3d at 277). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2006). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing." State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003) (citing Bland, 958 S.W.2d at 660; State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted). In addition, a jury may infer premeditation from a lack of provocation by the victim and the defendant's failure to render aid to the victim. State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Fritts, citing the pattern jury instruction on circumstantial evidence given in this case, argues that the evidence at trial did not exclude every other reasonable theory or hypothesis except that of guilt. However, we note that the State is no longer required to rule out every hypothesis except that of the defendant's guilt beyond a reasonable doubt. Instead, direct evidence and circumstantial evidence are treated the same when weighing the sufficiency of the evidence and there is no requirement that circumstantial evidence remove every reasonable hypothesis except that of guilt. See Dorantes, 331 S.W.3d at 381.

In support of his claim that the evidence is insufficient to support his conviction, Fritts asserts that Dr. Lewis admitted that the victim's time of death could have occurred any time during the twenty-four hours prior to the discovery of the victim's deceased body on March 6, 2007 at 5:15 p.m. In addition, he emphasized that the proof at trial established that the victim's husband kept the murder weapon, the hatchet, under his bed and that the victim's husband had five weapons on his person at the time he was questioned by police. Moreover, Fritts argues that the State overemphasized his statement that he left the victim's home in the morning, despite the fact that neighbors saw him near the crime scene in the late afternoon and that the State insinuated that he lied about killing the victim because he either lied or gave inconsistent statements to law enforcement about his whereabouts the day of her murder. Finally, Fritts asserts that the evidence collection team admitted that there were problems with the victim's cats running through the crime scene, which compromised the integrity of their investigation.

Viewed in the light most favorable to the State, we conclude that a rational juror could infer Fritts's identity as the perpetrator in this case based on the evidence presented at trial. The proof established that the victim was killed when she was struck with a hatchet more

than ten times. Dawn Stutler acknowledged that, prior to the victim's death, she had shown Fritts the location of her stepfather's knife under the mattress and that the hatchet was in the same location as the knife. Significantly, Fritts admitted that he was the last person to see the victim alive. Although Fritts denied hearing a struggle inside the house and denied seeing a blood trail in the house to Agent Corbit, the victim's blood was found on Fritts's pants and shoe. In addition, Agent Littlejohn testified that a partial shoe print in blood at the scene was consistent with the size, shape, and tread design from Fritts's right shoe Moreover, Agent Nelson testified that the white paint that had been sprayed on the victim's face and hand as well as the paint found on her sheet and sweatshirt was consistent with the paint on Fritts's Arby's shirt found in the closet of the home. Jill Longmeyer and Charles Powell testified that they saw Fritts a short distance away from the victim's home approximately an hour before the victim's husband returned home to find the victim's deceased body. Dalton Jones, who was housed in the same cell with Fritts following the offense, testified that when he asked Fritts why he had killed the victim, Fritts replied, "I just snapped. And when I came to, she was dead." Furthermore, Fritts's affiliation with the ICP gang also assisted the jury in identifying him as the perpetrator in this case. Fritts had a tattoo of the running hatchet man, a common tattoo worn by ICP gang members, and the lyrics in Fritts's notebook mentioned mutilation, depacipation, and biting female victims. The evidence presented at trial established that the victim was killed with a hatchet and that her assailant left bite marks. Moreover, evidence was presented that followers of the Insane Clown Posse band commonly paint their faces white, and white paint was found on the victim's face and hand as well as on her sheet and clothing. Given this proof, a reasonable juror could have found that Fritts was the perpetrator in this case beyond a reasonable doubt.

We also conclude that the evidence is sufficient to establish that Fritts acted with premeditation when he killed the victim. The proof at trial established that the victim suffered at least ten blows with the hatchet prior to her death. Law enforcement found clothes and towels containing the victim's blood and bone fragments in the washing machine, which indicated that Fritts had tried to dispose of some of the evidence related to the murder. In addition, after killing the victim, Fritts hid the hatchet in the attic of the garage and walked to the Git'N'Go convenience store. Despite Fritts's attempt to establish an alibi at the store, Longmeyer and Powell saw Fritts walking away from the victim's home around 4:00 p.m., approximately an hour before Mr. Busler returned home to find the victim deceased. Williams, who was incarcerated with Fritts after the victim's death, testified that Fritts admitted that the victim did not like him because he refused to support his family. Robin Ward, the victim's co-worker, testified that the victim told her the day before her murder that she was afraid of Fritts. Given this evidence, a reasonable juror could have found that the State established all the required elements for first degree premeditated murder. Accordingly, we conclude that the evidence was sufficient to support Fritts's conviction.

## CONCLUSION

Upon review, we affirm the trial court's judgment.

_____
CAMILLE R. McMULLEN, JUDGE